Peabody, J.
The paper signed by the treasurer of the Illinois Central E. E. Co. was a receipt of the company for $7500. It contained, also, an agreement that it should be repaid to Ludlow or his assigns, on demand, with interest at the rate of six per cent, or that it should be received in payment of $10 on each share of the stock to be issued to Mm when the directors should authorize the issue of the second million. The language, “to be repaid to him * * * * or received in payment ten dollars on each share * * * * to be issued to Mm,” &c., expresses a contract on the part of the company to do one or the other of those things. As an acknowledgment of the receipt of the money, it is explicit and its meaning unquestionable, and the subsequent part of it contains an agreement either to repay it on demand or accept it as a payment of $10 on a share on account of the stock to be issued. This part is in the alternative, to do one or the other. The paper does not show very clearly which party might elect between the alternatives, but the course of the business shows that it was the intention that Ludlow should elect which course should be taken, and this would probably be the meaning of the paper itself, considered separately from other evidence. The company then had $7500 of the money of Ludlow, which was to be repaid to him on demand, in money or by issuing to him stock of the second million, not then issued, but to be issued to him whenever the directors should authorize the issue of that million. (They had resolved (April 17, 1851) to issue it, and they agreed to issue to him the number of shares on which this sum would pay $10 per share. $7500 would pay $10 a share on 750 shares. It was then a contract either to repay him the money or issue to him 750 shares of their stock on which this sum, $7500 or $10 a share, was to be credited as paid, and the company was to do the one or the other at the *325 election of Ludlow or his assigns. It gave Ludlow or his assigns, then, the right, at his or their option, to receive from the company the money or the stock to the amount of it—750 shares. On the 1st of October, following, the Schuylers, being owners of this receipt and contract, indorsed on it, bearing date on that day, an assignment by which they transferred it to the plaintiff. By the transfer indorsed, they “ sell, assign and transfer” to him or his assigns the receipt, “together with the right to take and receive to his own use and account 150 shares of the stock to be issued as set forth in the receipt, reserving the remainder of the stock for our (their) own use and account.” This transfer is not very clear and intelligible by itself. Being in its terms an absolute sale and transfer of the whole receipt, the part which purports to authorize him to receive to his own use 150 shares, seems to be supererogatory. The paper called the receipt, gave to the holder the right to take the whole 750 shares of the stock, and the assignment of that to the plaintiff gave him apparently the right to take the whole of that amount. To follow the general transfer of that right with the words “ together with the right to take to his own use and account 150 shares of the stock,” seems unmeaning. But this grant of authority to take to his own use the 150 shares is followed by an express reservation of the rest of the stock (the 750 shares) therein mentioned, to the use of the grantors, in the following words : “ reserving the remainder of the stock to our own use and account.” This assignment then commences with an absolute transfer to the plaintiff of the right to take the whole 750 shares, and then proceeds in terms indicating an intention to increase his rights, to give him the further right to receive to his own use 150 shares of the stock, and closes with a reservation to the assignors, of the remainder (after deducting the 150 shares,) to their own use. The second part of this paper—that giving the right to take the 150 of the 750 shares—seems utterly unmeaning and ineffectual; the right to take the whole 750 (including, of course, this 150 with the rest) having been given in the preceding lines ; and the concluding part of the paper containing the reservation of all except the 150 *326 shares, for the use of the assignors, seems absolutely inconsistent with the first part, which gives the right to take the whole 750 shares. These last provisions seem entirely consistent with each other; but whether taken separately or together, they are both inconsistent with the first. To grant the right to 150 of 750 shares, and reserve the right to the rest of the 750, is consistent and intelligible; but to grant the right to 750 shares, and add to that a grant of 150 out of that 750, is not consistent; and to follow that with an express reservation of all except the 150, though quite consistent with the grant of the smaller number, is contradictory to the grant of the larger number, and cannot consist with it. To construe this paper in such a manner as to give effect to all its parts, is precisely our duty, if it be in our power ; but to do so it is pretty certain, I think, that we must have aid from ether evidence than that contained in the paper itself. There is evidence in the case, that on the same day on which this assignment was made by the defendants Schuylers, they gave to the plaintiff their promissory note for $7000, payable in six months, in which it is stated that they had deposited with him, with authority to collect, sell or assign the same, the receipt of the Treasurer of the Illinois Central Rail Road Company, for $7500, payable on demánd or receivable in payments of ten dollars on each share of the stock of said company, to be issued to R. <fc Gr. L. Schuyler, or their assigns, whenever the directors should authorize the issue of the second million of said stock, in pursuance of a resolution of the board of directors, passed April 17,1851. On the 3d day of April, 1852, this note was taken up and a new note at six months, for the same amount, containing the same statement of the deposit of the receipt of the treasurer as security, was given. This last note, at maturity, was taken up and succeeded by a new one in renewal for ninety days for the same amount, the interest on each of them being paid as they were taken up from time to time. The last note for ninety days also states that the Schuylers had deposited with the plaintiff the same receipt of the treasurer of the Illinois Central R. R. Co., and expressly says *327 it was so deposited “ as collateral security.” These notes, then, show the conditions and purpose of the general assignment of the receipt. They show that it was assigned as collateral security for the notes. The same assignment answered for the second and third notes, and no new transfer was made of the receipt, generally, for either of them; but at the same time with the making of the second note a new indorsement was made on the treasurer’s receipt, as follows: “ For value received, wé hereby assign and transfer to W. S. Miller, the right to take a further 150 shares of the stock within mentioned, when the same is issued, making in all 300 shares which are to be delivered to him. Dated April 3, 1852.”
In each of these notes, the fact that the plaintiff held the receipt as security is stated. The assignment of the rights of the Schuylers under the receipts was intended merely as collateral security for the payment of the money on the notes, and so far as that was concerned it was redeemable by payment of the money. Nothing is said in the notes about the other provisions in the paper called an assignment—that respecting the 150 shares, or that about reserving to the assignors, the Schuylers, the residue of the 750 shares. As to these parts, the paper must stand, and effect must be given to it, according to it own terms and meaning. Nothing in the case goes to modify these terms.
After the giving of the last note, and before it fell due, the company, by a resolution bearing date on the 17th day of November, 1852, created and distributed 70,722 new shares of the stock. This stock, the plaintiff says, was distributed among the stockholders as an increase or addition to the stock held by them, including the scrip, and' in the proportion of one share and seven-eighths of the new stock for each share of the old ; and he claims that he was entitled, as holder of the 300 shares, to 562 shares of this new stock as an accumulation of, and an addition to, his 300 shares.
To this claim several objections are interposed by the defendants : 1st. That the plaintiff, at the time of the creation of the new stock, was not the holder of the 300 shares; that he *328 merely had the right to elect to take them, but had not elected. 2d. That if he was owner of the 300 shares, he had no right, as such owner, to a distributive share in the new stock. And by the company it was insisted, 3d. That all his rights were matters between himself and the Schuylers, of which the company had no legal notice, and which they were not boupd to regard.
As to the first objection, there is nothing in the case to show that the plaintiff, on the 17th day of November, 1852, had determined to take the 300 shares which the defendants Schuylers had given him the right to take. They gave him the right to take 150 shares, by an indorsement on the receipt, bearing date the 1st day of October, 1851, and the right to take 150 shares more, making 300 in all, by another indorsement thereon, bearing date the 3d day of April, 1852. These indorsements were in form assignments to the plaintiff of the right to take this number of shares of the stock. The original receipt of the treasurer gave the Schuylers, or the holder, only the right to take the 750 shares therein mentioned, at their option, and the holders of that could not, by virtue of it, claim to be holders of the stock mentioned therein, or to have any rights to it until they had elected and given notice of their intention to take it. The plaintiff, therefore, until he had done this, had no right to this stock, either as between him and the Schuylers, or as between him and the company.
The receipt gave the holder of it only this right as against the company; and the Schuylers merely gave the plaintiff the same rights they had as to 150 of the shares therein provided for. The plaintiff does not aver in his complaint, or prove, that he had made his election, to take the shares or not, much less does he aver or prove that he had given notice of his election, either to the company or to the Schuylers, and he had no right as against either of them, to the stock, until he ha.d both elected and given notice of his election. If he had exercised his right of election, and had notified the Schuylers, he would then have had a right to the stock, out of their 750 shares. If the company had been properly notified by him of his rights and of his *329 election to take, and that he should look to them to issue it to him, they would probably have been bound by that notice, and he would, as to both of them, probably have been entitled to the stock, and would thereby have acquired the rights of a stockholder as to any new issue of stock. The only averment of an election by him, in his complaint, occurs at fol. 17, and he there only avers that on the 20th day of December, 1852, he gave to Robert Schuyler the receipt of the treasurer, to enable him to receive for him (the plaintiff) such stock as the plaintiff might be entitled to from the company, and that said Schuyler did deliver to him the 300 shares, on the 23d of that month. There is no claim or evidence of an election or notice by the plaintiff until this time. This, I suppose, may be considered an election, and notice of it to the Schuylers, at least ; and from this time forth, as between the plaintiff and' the Schuylers, he was entitled to, and had, the rights of owner of this stock.' But the 70,722 shares had been created, and partially or wholly distributed before this time. The rights of the plaintiff must depend on the condition of things at the time the stock, of which he claims a distributive share,-was created and issued. At that time he was not owner of this 300 shares or any part of it. More than a month after that he became, by his own account, the owner of it, to be sure; but he could not retroactively acquire any right to it, and he did not. The title to it had already vested in some one else, perhaps, and whether it had or not, he had no right to it. His purchase of the 300 shares was made, in effect, in December following—more than a month thereafter.
The second point is, that even if he were holder of the 300 shares, he was not entitled for that reason to the distributive share of the new stock. The ownership of stock of the company gave to the owner an undivided interest as owner, in the property of the corporation—an interest which bore the same proportion to the whole property, as his shares did to the whole number of shares. This right was a right or proportionate interest in the assets of the company, and in the proceeds and benefits of the property of the company. These assets *330 were the property of the corporation. This was a right not to any part of the assets, separately and exclusively—not a right to an immediate, exclusive possession of, or property in, any particular part of those assets 5 not a right to an immediate distributive share of the assets or any part of them—and no more a. right to a distributive share of any stock of the corporation belonging to itself, than to any other property belonging to it. Prima facie all the property of the corporation was dedicated to its use for the purpose of advancing the enterprise for which it was organized ; and any stock it might own, whether of its own capital or that of any other company, like any other' property,- was to be used in the discretion of its officers to accomplish that end in the manner most beneficial to the corporation, and corporators as such. As to the 70,722 shares of stock they resolved to create, that, as soon as created, belonged to the company, and like other property was to be used for its benefit and advancement in the business to which its energies were to be applied. In the hands of its directors and agents the $35 per share which that was worth was properly applicable, like its other funds and means, immediately to the advancement of the interests of the corporation, and in this manner to the benefit of its corporators or stockholders. To divide this at once among the stockholders, in proportion to their interests respectively, would have been to withdraw from the treasury of the company the sum which it was worth, and diminish to that extent its means ; a measure which might or might not be for the best interests of the company, and its members, and which as it might or might not seem so to its directors and agents, it became their duty to adopt or reject, but it was one which at any rate neither the plaintiff nor any stockholder could demand as his right. It is not shown "that such a distribution was made among the stockholders generally, and I think there is some evidence that it was not, but in the absence of evidence on the subject, the view most favorable to the plaintiff, we cannot assume that it was, but are bound to suppose that this fund was administered like other assets of the company in the manner deemed on the whole most bene *331 ficial. Whatever disposition was made of it, the stockholders get the benefit of it directly or indirectly.
The only question remaining to be examined, is that of notice ; and this relates only to the liability of the company. The plaintiff says that it had notice. 1st. Through Robert Schuyler, with whom as a member of the firm of R. & G. L. Schuyler, the plaintiff dealt as to the stock. 2d. That it had notice by the production to it of the treasurer’s receipt with the indorsement thereon, at the'time the stock was issued upon it 'and it was surendered.
The notice claimed through Robert Schuyler is claimed on the ground that he being president of the company, it is bound by any information he had. But it must be borne in mind that he had no intercourse on this subject with the plaintiff as president of the company. The plaintiff had no intercourse with the company on this subject, either through Schuyler or otherwise. He had no dealing with Robert Schuyler, for himself, even. He dealt with the firm of R. &, G. L. Schuyler, and his dealings with this firm were through the medium of Robert, who, as a member of that firm, had the power of an agent to bind it by his acts, in its name and on its behalf. But notice to R. & G. L. Schuyler, was not notice to the company. Neither is notice to Robert notice to the company, in a matter in which he represents, not the company, but R. & Gr. L. Schuyler. In this matter, Robert did not represent the company at any time. Notice to an agent, in a transaction for which he is employed, is notice to his principal, and it is only in such a case that the principal (whether a corporation or a natural person) is bound by notice to his agent. No notice, as such, was in point of fact given to him in any character, as president or agent of the company or otherwise. Certain information, it is true, came to him casually, while acting as agent of R. & G. L. Schuyler, that that firm had contracted conditionally to sell to the plaintiff some stock "of this company, without an intimation, however, that it was intended or designed to give notice to him, or the company, or that he as president, or the company as his prin *332 cipal, should take notice of it or regard it, or the rights or claims of the plaintiff in relation to the subject of it. Such information, thus received, (if notice it can be called at all) does not bind the company as notice. (Ang. & Ames on Corp. §§ 305, 306, 307, 308 National Bank v. Norton, 1 Hill, 578. Fulton Bank v. N. Y. and Sharon Canal Co. 4 Paige, 136.)
The surrender of the certificate or receipt with the indorsements thereon, has still less the semblance of a notice. In the first place, the surrender was made after the 20th of December, and long after the new stock was created and the mode of i'ts distribution resolved on and formally acted on by the company with certain parties, on terms which gave the transaction the nature of a contract between the company and the parties contracting to take. And in the second place, the paper was in possession of Robert when they first saw it, and it was surrendered by him as a member of the firm of R. <fc G. L. Schuyler, in whose hands the receipt, even with the indorsements thereon, was presumptively the property of the firm which he represented, and not of the plaintiff. Such a paper with the assignment indorsed, in the hands of the assignor, prima- facie belongs to him and not to the person named as assignee in the assignment, thus apparently not completely executed by a delivery, or else surrendered to the assignor and in his power for the purpose of cancellation or other disposition.
The surrender by him to the company, was in itself a representation by him that he had the authority to surrender, and his mere' possession of the assignment accompanied with this representation and act, was far from being evidence to the company that he did not own the certificate, or had parted with his right to it; so that, 1st. If, as between the Schuylers and the plaintiff, he had been entitled to the 562 shares, the company had no notice of his rights, and were not bound by them; and 2d. As between him and the Schuylers he was not at the time the new stock was created and his right to it is said to have accrued, the owner of the 300 shares upon the strength of his title to which he bases his claim; and 3d. The ownership of *333 these 300 shares did not necessarily, nor as far as the evidence shows, entitle the holder to the 562 shares and a distribution or delivery of them to him, -whoever he may have been.
[New York General Term,
June 6, 1857.
A new trial must be granted; costs to abide the event.
Mitchell. P. J., concurred,
Roosevelt, J., dissented.
New trial granted.
Mitchell, Roosevelt and Peabody, Justices.]